IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID F. HAKA,                                              OPINION AND
                                                           ORDER
                    Plaintiff,
                                                           3:06-cv-00594-bbc
          v.

LINCOLN COUNTY and
LINCOLN COUNTY BOARD OF SUPERVISORS,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      "You know what happens to whistle blowers in Lincoln County?  They get fired."

At least, that's the view expressed by one member of defendant Lincoln County Board of

Supervisors while discussing a complaint accusing defendant Lincoln County of falsely

claiming that it was entitled to federal reimbursement for certain activities related to child

support enforcement.  Plaintiff David Haka helped his boss investigate the complaint.

      A few months after that complaint was filed with the United States Attorney for the

Western District of Wisconsin, plaintiff lost his job as administrator of the county's child

support agency as a result of the board's decision to "reorganize" the agency.  (Plaintiff's

boss left his job as well, resigning after board members initiated a disciplinary investigation

1

against him.) After defendant eliminated plaintiff's position, it did not consider him for reassignment and it rejected his application for another county position several months later.

Plaintiff contends that defendants' elimination of his position and refusal to reassign him and later rehire him violated the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), which prohibits employers from taking an adverse action against an employee "because of lawful acts done . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." In addition, plaintiff brings a retaliation claim under the First Amendment (via 42 U.S.C. § 1983) and state law claims for wrongful discharge. Defendants have moved for summary judgment on each of these claims.

I will grant the motion with respect to all of plaintiff's claims against defendant Lincoln County Board of Supervisors and with respect to plaintiff's claims against defendant Lincoln County under the First Amendment and state law. The complaint will be dismissed as to the board because plaintiff has failed to show that it has the capacity to be sued. Plaintiff's First Amendment claim is barred by <u>Garcetti v. Ceballos</u>, 126 S. Ct. 1951 (2006), because the speech that provides the basis for the claim was related to plaintiff's responsibilities as the child support agency administrator. Plaintiff's state law claim fails because plaintiff was an at will employee and he identifies no public policy that his termination violated, other than the policy of the False Claims Act. Because the tort for

2

terminating an employee in violation of public policy applies only when no other remedy exists, plaintiff cannot proceed on that claim.

I cannot come to the same conclusion with respect to plaintiff's claim under the False Claims Act against defendant Lincoln County. Plaintiff's participation in the investigation was protected under § 3730(h) and a reasonable jury could find that the county's actions were motivated by his protected conduct. Unfortunately for defendant Lincoln County, the supervisor's statement about firing whistle blowers is only the tip of the iceberg. A number of key players made statements or took actions expressing a strong hostility to the complaint and an interest in "getting rid of" those involved with it. Although the county advanced several reasons for its actions, a jury would be entitled to find that these reasons are themselves indicative of retaliation or are pretexts covering up illegal motives. Accordingly, I will deny defendants' motion for summary judgment with respect to plaintiff's claims against defendant Lincoln County under the False Claims Act.

The undisputed facts, taken from the parties' proposed findings of fact and the record, are set forth below. I have disregarded a number of proposed facts from both sides because they were not properly supported by admissible evidence. In many instances, a party cited testimony from a witness who had no involvement in the matter that was the subject of the testimony. When it was not clear from the testimony how the witness knew the information about which he or she was testifying, I did not consider that testimony.

3

Under Fed. R. Civ. P. 56(e), affidavits and deposition testimony must be made on personal knowledge. When a witness fails to show that he has personal knowledge of the matters in his an affidavit or deposition, a court may not consider those matters on a motion for summary judgment. <u>Watson v. Lithonia Lighting</u>, 304 F.3d 749 (7th Cir. 2001).[1]

## UNDISPUTED FACTS

### A. <u>The Board</u>

At the time of the events giving rise to this lawsuit, defendant Lincoln County Board of Supervisors included the following members: E. Richard Simon (chairman of the board and member of the Administrative and Legislative Committee), Robert Lee (chairman of the Finance Committee), Curtis Powell (member of the Finance Committee), Robert Weaver (member of the Finance Committee and Administrative and Legislative Committee), Robert Lussow (member of the Finance Committee), Michael Kleinschmidt (member of the Finance

---

[1] Just before this opinion was released, defendants filed a motion to "strike" portions of affidavits submitted by plaintiff and some of the proposed findings of fact derived from those affidavits. The motion will be denied. If defendants believed that any of plaintiff's proposed findings of fact were improper, defendants were required to object to those facts in their response. To the extent defendants are simply repeating objections they made previously, their motion to strike is redundant and unnecessary. To the extent defendants are raising new objections, it is too late to do so. The briefing for defendants' motion for summary judgment was finished six weeks ago and defendants provide no justification in their motion for their delay.

Committee), Ronald Mittlesteadt, James Alber, Melissa Schroeder and Philip Cohrs.  The board had a total of 21 members.

## B. Plaintiff's Employment with Lincoln County

In February 2000, plaintiff David Haka began working for defendant Lincoln County, Wisconsin as the child support administrator.  At that time, the child support agency was part of the social services department.  Plaintiff supervised two child support specialists and a fiscal specialist.

Plaintiff was given a one-year "probationary period" when he was hired. After an employee passes that period (plaintiff did in February 2001), he has a right to pursue grievance procedures if he is terminated.  Plaintiff had no employment contract with the county.

Throughout his tenure as the administrator of the child support agency, plaintiff consistently received positive performance evaluations from his supervisor and the Social Services Committee.  The agency received "Certificates of Excellence" for the years 2000, 2001, 2002 and 2005.  Plaintiff was never disciplined while he was the child support administrator.

Plaintiff's job description did not include recommending policy.

C. Financing for Child Support Enforcement

Two-thirds of the county's costs for child support enforcement are reimbursed by the state through the Wisconsin Department of Workforce Development, which in turn receives funding for child support enforcement from the federal government under Title IV-D of the Social Security Act. Plaintiff's responsibilities included insuring that the social services department made appropriate claims for reimbursement and maintained proper records. His duties did not include auditing claims for reimbursement. (There is some disagreement between the parties regarding the relative responsibilities of plaintiff and corporation counsel in insuring that corporation counsel's claims for Title IV-D reimbursement were appropriate. However, I need not resolve the disagreement for the purpose of defendants' motion for summary judgment.)

D. Plaintiff Discovers Claims for Reimbursement for Work of Corporation Counsel's Program Assistant

When plaintiff was the administrator, the child support agency received legal services related to enforcement activities through a cooperative agreement with the Lincoln County corporation counsel office. Corporation counsel would submit monthly expense reports to the child support agency detailing the office's activities relating to child support enforcement. Plaintiff did not review claims for reimbursement for the salaries of employees

6

in the corporation counsel office.

In September 2003, claims for Title IV-D reimbursement from the office of corporation counsel were placed in plaintiff's mailbox inadvertently.  Upon reviewing the claims, plaintiff learned that corporation counsel was seeking reimbursement for child support enforcement activities of Cathy Tupper, a program assistant.  This surprised plaintiff because he believed that all the child support enforcement activities in the corporation counsel office were being performed by assistant corporation counsel Donald Dunphy and his legal secretary.

Plaintiff reported his discovery to his supervisor, David Chapleau, the director of the social services department.  Chapleau told plaintiff to continue monitoring the situation. At an October 2003 open meeting of the Social Services Committee of the Lincoln County Board of Supervisors, Chapleau stated that he and plaintiff had determined that there may be a problem regarding corporation counsel's claims for reimbursement under Title IV-D. Chapleau confirmed at the next committee meeting in November that he and plaintiff were continuing to monitor the situation.

When plaintiff reviewed reimbursement requests again in November 2003, he saw that corporation counsel was still claiming time for child support enforcement activities performed by Tupper.  Plaintiff interviewed Tupper about the time she was claiming for reimbursement and he passed on the information he learned to Chapleau.

7

E. <u>Employee Complaints Against Plaintiff</u>

The child support agency shared office space with corporation counsel and assistant corporation counsel Donald Dunphy devoted much if not all of his time to child support matters.  As a result, plaintiff worked near Dunphy's secretary, Sandra Yorde, and on common matters.

On November 25, 2003, Yorde filed a complaint with corporation counsel Nancy Bergstrom, in which she alleged that "over the past six (6) months I have been made a victim of sexual harassment because I would not go on a date with" plaintiff.  According to Yorde, plaintiff had asked her out on a date three days after her divorce became final in January 2003.  When she declined, his behavior toward her at work changed:  he stopped greeting her, avoided her whenever possible and became "irritated" with her when she needed to ask him a question.

John Mulder, the administrative coordinator and personnel director for Lincoln County, interviewed both plaintiff and Yorde about the letter.  During his interview, plaintiff admitted that he had asked Yorde out on a date and knew that her divorce was final because he had looked it up on a public internet database of Wisconsin court proceedings.  However, he had not violated any county policies.

At the January 2004 meeting of the Social Services Committee, Mulder reported that the issues raised in Yorde's complaint did not constitute sexual harassment.  At the close of

his investigation, Mulder did not prepare a written report, did not recommend that any disciplinary action be taken against plaintiff and did not ask plaintiff to do anything in response to the complaint. Mulder told him to "move forward." (The parties dispute other parts of plaintiff's and Mulder's exchanges.  For example, defendants say that plaintiff refused to "accept responsibility" for his actions, but plaintiff denies that Mulder asked him to accept responsibility for anything.)

Yorde filed another complaint, this one alleging that Chapleau was retaliating against her for filing a complaint against plaintiff.  The county appointed a lawyer to investigate that complaint, but the lawyer found no evidence of retaliation.  (Yorde later filed another complaint against plaintiff's successor as child support agency administrator.)

In June 2004, plaintiff gave a performance evaluation to Jessi Carstensen, a child support specialist. In the evaluation he complimented some areas of her performance and pointed out others that he said needed improvement.  In response, Carstensen drafted a memo to Mulder in which she alleged that her evaluation was not as positive as "a result of my participation in the sexual harassment/retaliation investigation, and continuing to maintain a relationship with Cathy Tupper and Sandy Yorde."  However, she was "not requesting that [Mulder] take any further action at this time" because it did "not appear that the county intends on addressing this issue anyway."

9

F.  <u>Department of Workforce Development Decides to Conduct an Audit</u>

Chapleau prepared a binder compiling information regarding the time claimed by the corporation counsel office for Title IV-D reimbursement.  Some of the documentation in the binder described the assistance plaintiff provided in compiling the information.  At the June 17 Social Services Committee meeting, members reviewed the binder.  At a follow up meeting on June 28 attended by then-board chairman E. Richard Simon, members agreed to give the binder to outside legal counsel for review.

After reviewing Tupper's daily time logs (which included the time she was claiming to spend on child support enforcement), plaintiff wrote a letter dated July 8, 2004 to corporation counsel and Simon.  Plaintiff wrote that "[t]he activities claimed by Ms. Tupper for child support activities are very questionable as allowable costs" because those activities were "not necessary and reasonable for proper and efficient program administration."  He concluded that it would be "necessary to develop a corrective action plan to avoid future fiscal sanctions."

Chapleau contacted the Wisconsin Department of Workforce Development and reported that the county had improperly requested reimbursement for work performed by an assistant in the corporation counsel office.  As a result, the department decided to conduct an investigation.   The Social Services Committee discussed the pending investigation at an August 2004 meeting.

10

At an Administrative and Legislative Committee meeting in the fall of 2004, Bergstrom said that there had never been any problems with corporation counsel's billing practices "until Chapleau stuck the state [Department of Workforce Development] on her." Board chairman Simon asked Bergstrom, "Would the audit have happened if Dave [Chapleau] hadn't turned us in?" Bergstrom said no.

In a letter to Mulder dated November 8, 2004, Simon discussed the "State investigation." He "demand[ed] to know who reported it as a violation," concluding that "it can't be whistle blowing if it is the person in charge of the program who approves the reports."

### G. Plaintiff's November 9 Letter Regarding the Agency's Legal Needs

On November 9, 2004, plaintiff wrote a letter to Bergstrom, informed her that the child support agency needed only 15 hours a week of legal services, not 40 hours a week. (Previously, Bergstrom had expressed the opinion that a full time position was needed.) When plaintiff's letter was discussed at a November 30 county board meeting, supervisor James Alber became upset, yelling at plaintiff and "getting in his face." Alber was adamant that 40 hours of legal services were needed and that plaintiff did not have authority to make a suggestion about the legal services needs of the child support agency. (It was true that plaintiff did not have authority to set policy regarding the hours of legal services that would

11

be dedicated to the child support agency.)  Simon said that plaintiff's letter "could cause difficulties for Lincoln County as it attempted to defend itself from the DWD audit."  Both Mulder and Simon believed that plaintiff might attempt to reduce the number of hours claimed by the county for reimbursement of child support enforcement.

In a letter dated November 19, 2004, to Chapleau and supervisor Melissa Schroeder, Simon objected to plaintiff's recommendation regarding the legal needs of the child support agency.  Simon wrote that plaintiff's November 9 letter was "clearly contrary to the County's position" of requiring the assistant corporation counsel to work "100%" on child support enforcement activities and that plaintiff's suggestion was "well beyond [plaintiff's] jurisdiction and authority."  Simon said he "expect[ed]" that the board would "continue with current County policy."  Simon repeated his belief that plaintiff's November 9 letter "could compromise the DWD issue."

In another letter, also dated November 19, Mulder and Simon said that plaintiff's November 9 letter was a sign of a "significant problem" between the Department of Social Services and the corporation counsel office that was "significantly harming the collective position of Lincoln County" regarding the state's "proposed cost disallowance."

## H.  Audits

An accounting firm conducted an audit of Lincoln County for 2004.  The firm

12

concluded that the county had failed to adequately support its claims for reimbursement: "The payroll records and other supporting documentation indicates that certain of the Assistant Corporation Counsel's activities during that time period may have included non-child support activities." In addition, "Lincoln County, Wisconsin did not comply with requirements regarding fiscal records and reporting that are applicable to its Child Support Enforcement Program. Compliance with such requirements is necessary, in our opinion, for Lincoln County to comply with the requirements applicable to that program."

After the Department of Workforce Development finished its audit of Lincoln County's claims for reimbursement under Title IV-D, it concluded initially that the office of corporation counsel had incorrectly claimed $282,000 for the years 2002, 2003 and 2004. (After several years of further investigation and negotiation, the county settled its dispute with the department for approximately $20,000 in 2007.)

Simon viewed the results of the audit as "sudde[n] and suprisin[g]." The issue of over-billing was a "point of contention" for many county board supervisors. Local media covered developments surrounding the state audit.

I. <u>Initial Plans to Reorganize the Child Support Agency</u>

Near the end of 2004, the Administrative and Legislative Committee of defendant Lincoln County Board of Supervisors began considering options "to deal with the turmoil

between staff in the Child Support Agency and the Corporation Counsel department."

In January 2005, Simon wrote a memo titled "Child Support/Corporation Counsel Resolution."  One of the proposed resolutions was to "creat[e] a separate Department to oversee the Child Support process with Asst. Corp. Counsel as Department Head."  Because plaintiff is not an attorney, he would not be qualified for the assistant corporation counsel position.  On January 27, Simon discussed some of the proposals in the memo with Bergstrom, Mulder, Chapleau and county supervisor Melissa Schroeder.  However, Simon did not provide a copy of the memo to the others and he omitted any reference in his discussion to the possibility of making assistant corporation counsel head of a new child support department.  (The parties dispute whether Simon had another meeting with Chapleau and Schroeder in January in which Simon discussed the possibility of making the child support agency "stand alone," with the assistant corporation counsel as the agency head.)  Chapleau agreed to obtain information about other counties with a child support agency that receives legal services from corporation counsel.  Mulder began to study options for reorganizing the agency.

## J. Chapleau's False Claims Act Complaint

On February 9, 2005, Chapleau sent a complaint to the United States Attorney for the Western District of Wisconsin with the heading "Federal False Claims Act (Lincoln

14

County, Wisconsin)." In the complaint, Chapleau alleged that Lincoln County was improperly seeking reimbursement for child support enforcement activities. He included the following about plaintiff's involvement in his investigation:

> In 2003, Mr. Haka discovered that the Corporation Counsel's office's IV-D claims included expenditures related to the activities of Cathy Tupper, a program assistant employed by the office. This was Mr. Haka's first knowledge that Ms. Tupper allegedly was performing child support enforcement activities. It was his (and my) understanding to that point in time that only Corporation Counsel Nancy Bergstrom, Assistant Corporation Counsel Donald Dunphy, and Sandra Yorde, a legal secretary, were performing any work for which the Corporation Counsel's office was requesting any IV-D reimbursement. Historically, Yorde had performed all clerical work of which we were aware related to child support enforcement activities and, hence, our surprise upon learning that Ms. Tupper claimed to be performing such activities. When Mr. Haka brought this information to my attention in September 2003, I asked that he take active steps to monitor Corporation Counsel's expenditure submissions related to Ms. Tupper.

> On November 18, 2003, Mr. Haka reviewed with me the Corporation Counsel's submission of additional expenditure reimbursement requests related to Ms. Tupper's alleged work on child support enforcement activities. I then approached Corporation Counsel Bergstrom and raised the issue with her.

The complaint was drafted by Chapleau's lawyer.

Mulder received and read a copy of Chapleau's complaint and he knew that plaintiff had provided information to Chapleau that was used in preparing the complaint. Simon also received a copy of the complaint and read it. Chapleau's complaint and the Department of Workforce Development audit were "big news" in the county. "[E]verybody was talking about" those issues.

15

At the February 15 county board meeting, supervisor Philipp Cohrs gave supervisor Curtis Powell a copy of Chapleau's complaint.  Powell was a member of the Finance Committee and "trusted" by other board members.  Powell read "every page" of the complaint; he noticed that plaintiff had provided information to Chapleau that was used in the complaint.

After reading the complaint, Powell never spoke to Chapleau again.  However, Powell decided almost immediately to initiate an investigation of Chapleau.  In addition, he approached Yorde to discuss her complaints against Chapleau and plaintiff.  Powell believed that the "whole Chapleau thing [would be] trouble until we got it resolved."

Powell asked for expense records from Chapleau as well as Cohrs.  Cohrs had told Powell that he believed the county was engaged in a cover up and Powell wanted "to make [Cohrs] dance" and "tighten up his shorts a bit."  Powell believed that he could make Cohrs "shut up" by "look[ing] in the backyard."

In a letter dated February 21, 2005, Chapleau provided the information Simon requested at the January 27 meeting.  However, after Chapleau sent the February 9 complaint, no one ever discussed with him options for reorganizing the child support agency.

On February 22, Bergstrom issued a press release, denouncing Chapleau's February 9 complaint, suggesting that it was "motivated by revenge" for Yorde's harassment and retaliation  complaints and that Chapleau was "desperate to deflect attention away from

16

himself."

On March 1, 2005, the Personnel Committee held a meeting during which the members discussed Chapleau's complaint. Immediately after that meeting supervisor Robert Lussow said to Schroeder, "You know what happens to whistle blowers in Lincoln County? They get fired."

On March 24, 2005, Powell asked the Finance Committee of the Lincoln County Board of Supervisors to refer a "due process investigation" of Chapleau to the Administrative and Legislative Committee. (Neither side explains what a "due process investigation" is.) Powell identified three reasons for the investigation, including the $280,000 that the state was claiming defendant had incorrectly claimed. In addition, Powell alleged that there was a $1700 discrepancy in Social Service Department's welfare trust account and that the department had failed to adequately fund the Family Resource Center. Powell blamed each of these issues on Chapleau, but did not explain why. This was the first time that Powell had ever questioned Chapleau's performance. (Powell did not pursue the second two issues further. In fact, Powell was wrong about both the $1700 discrepancy and about the amount of funding to the Family Resource Center.)

At an April 7, 2005 Administrative and Legislative Committee meeting, Powell said that Chapleau's February 9 letter should be investigated because Chapleau may have been at fault for failing to catch errors in corporation counsel's claims for reimbursement. He

17

provided no specific evidence for that belief.

After the April 7 meeting, Mulder told Schroeder that Chapleau should be placed on administrative leave with pay.  At an April 11 meeting (which was held in closed session), Schroeder asked why any action needed to be taken against Chapleau.  Lussow said only that the county "needed to act now," without explaining why.  When Schroeder asked whether Bergstrom should be suspended with pay as well, Simon said that Bergstrom did not have to be suspended because she did not file a federal false claim complaint against the county.

At a May 2005 county board meeting, members discussed Chapleau's February 9 complaint.  Weaver was "distraught" over the complaint.  Powell and Lussow moved to put Chapleau on administrative leave, but the motion was later amended and Chapleau was not placed on leave.  After that meeting, Lussow and Weaver said to supervisor Cohrs that "whistle blowers have got to go" in the context of discussing Chapleau's complaint.

The United States Attorney began an investigation as a result of Chapleau's complaint.  In the spring or summer of 2005, federal investigators came to plaintiff's office to interview him about Chapleau's allegations.  Other employees at the Department of Social Services and the corporation counsel office knew about the meeting.

Mulder issued a "due process complaint" against Chapleau.  On June 30, 2005, Powell proposed to Schroeder that they make a "deal" with Chapleau to drop the complaint in exchange for his leaving and one year of salary.  In a later discussion about the proposed

18

deal, Powell told Schroeder, "I heave heard all about David Haka." Powell said that a woman who worked with plaintiff in Marathon County told Powell that plaintiff "had a lot of problems" there. Powell did not explain why he was bringing up plaintiff's past employment. Ultimately, Chapleau entered into a "settlement agreement" to end his employment with the county on October 1, 2005. Mulder became plaintiff's supervisor after Chapleau's departure.

### K. Resolution to Reorganize the Child Support Agency

In a memorandum dated August 16, 2005 to Mulder, Bergstrom and finance director Dan Leydet, Powell recommended that Lincoln County make the child support agency its own department with the assistant corporation counsel as its head. This would eliminate plaintiff's position. Powell wrote: "I am willing to step forward and 'grease the skids' and make some things happen, right or wrong, something is going to happen . . . SOMETHING MUST BE DONE AND BY ALL SAINTS, I AM GOING TO MAKE SOMETHING HAPPEN, ONE WAY OR THE OTHER."

Powell disregarded all other options. He did not perform a case load analysis of his plan, prepare any cost calculations and he "did nothing in terms of analyzing personnel." He did not know what the fiscal impact of his plan would be.

In a memo dated August 24, 2005, Mulder outlined the advantages and disadvantages

19

of various reorganization options.    With respect to the option of "Separate Dept w/ Assist Corp Counsel as Dept Head," Mulder identified the "strength" as "reduces conflict about work direction" and the "weakness" as "staff changes."  No one else saw this memo.

The Administrative and Legislative Committee considered Powell's proposal at a September 12, 2005 meeting.  During that meeting, Simon and Mulder said that they knew plaintiff and Chapleau were providing information to federal authorities.  Simon said that he was asking the Wisconsin Attorney General's office to consider charges against any Lincoln County employee who provides information to federal authorities.  Mulder asked Schroeder whether she had provided such information. The committee unanimously approved Powell's proposal for reorganizing the child support agency and forwarded the necessary ordinances to the full county board.

At the September 27 county board meeting, the board voted on Powell's proposal.  Neither Powell nor anyone else supported the resolution with any financial, budgetary or case load data.  No one had performed a case management study to determine whether the resolution made business sense.   In fact, Powell provided board members with no documentation supporting his proposed resolution.  Powell stated incorrectly that county revenue would be increased under the proposed reorganization.

The board approved the following resolution by a vote of 17 to 4:

WHEREAS, Lincoln County has been embroiled in a long-running controversy

20

concerning child support issues with the State of Wisconsin; and

WHEREAS, that controversy has been centered around financial issues; and

WHEREAS, in the interest of adhering to good internal auditing controls, separation of duties, sound financial management, and improve efficiencies;

THEREFORE LET IT BE RESOLVED, the County Board of Supervisors of the County of Lincoln, commencing on January 1, 2006, acting for the betterment of all, announces its intention and so notifies the Bureau of Child Support, State of Wisconsin to provide child support enforcement, services and accountability through a free-standing agency created by Lincoln County entitled the Lincoln County Child Support Agency separate and apart from the Lincoln County Department of Social Services and Corporation Counsel, directed by the Child Support Attorney, with oversight by the Finance Committee, Board of Supervisors, County of Lincoln, Wisconsin.

The resolution did not address its effect on plaintiff's position and many of the supervisors were unaware of the effect that it would have. (One supervisor, Robert Lee, cannot remember the specifics of the resolution but understood it to "separate" the child support agency and corporation counsel "because of some allegations.")

L.   Plaintiff's False Claims Act Complaint and the Elimination of His Position

On October 10, 2005, Mulder told Schroeder that the Finance Committee was going to use the county board's resolution to "get rid of" plaintiff before the end of the year.

In a five-page letter dated October 31, 2005, to the United States Attorney for the Western District of Wisconsin, plaintiff identified what he perceived as county violations of the False Claims Act.  On the same day, plaintiff hand delivered a copy of the letter to

Mulder's office.

The allegations in plaintiff's October 31 complaint were almost identical to the allegations in Chapleau's February 9 complaint.  Plaintiff previously had given some of the information in his complaint to the federal agents investigating Chapleau's allegations.

The board's Finance Committee placed discussion of the reorganization of the child support agency  on the agenda for a meeting on November 4, 2005.  Finance Committee members Powell, Lussow, Weaver, Kleinschmidt  and Lee were present at the November 4 meeting.  Mulder made a recommendation to eliminate plaintiff's position, make assistant corporation counsel Kurszewski head of the child support agency and remove plaintiff from his duties immediately.   Mulder said that eliminating plaintiff's position would save $38,000, but he did not do any calculations to support this figure. He did not speak to other child support agencies about his proposal. He recommended the elimination of one support staff position as well.

In a closed session from which plaintiff was excluded, Mulder gave four reasons for recommending that plaintiff be removed from his position immediately: (1) plaintiff may be "disgruntled"; (2) plaintiff had alleged "problems with coworkers"; and (3) plaintiff's presence would not "foster a healthy work environment"; and (4) Mulder had "heard" that plaintiff had been destroying child support documents, an allegation that Mulder did not investigate.  In addition, Mulder told the committee that plaintiff had filed a False Claims

22

Act complaint against the county.

Powell and Lussow moved to accept Mulder's recommendation. Without any discussion, the remaining committee members carried the motion. Powell, Lussow, Weaver, Lee and Kleinschmidt voted for the resolution solely on the basis of Mulder's recommendation. The matter took less than 10 minutes, even though it was the first time that the county had eliminated a "middle manager" position. Immediately after the meeting, Mulder and assistant corporation counsel James Kurszewski "summarily walked [plaintiff] off Lincoln County premises." Mulder gave plaintiff no explanation for the decision, except that he told plaintiff that he would receive his salary and benefits through December 31, 2005. Mulder anticipated that plaintiff would perceive the decision as retaliation.

Although Mulder "suspected" that Kurszewski could manage the child support agency, no one sought input from plaintiff or Kurszewski regarding the reorganization of the child support agency or the decision to relieve plaintiff of his duties immediately. Kurszewski was never interviewed for his new position of head of the child support agency and he was never asked whether he wanted the position. In fact, Kurszewski did not want the job because he did not have the budgeting and management skills needed for it. At the time of the change, Kurszewski had not completed his probationary period with the county.

No one discussed other employment opportunities with plaintiff, such as becoming a social worker for the county. Multiple social worker positions were vacant at the time, but

23

Mulder did not tell plaintiff about them, even though Mulder knew that plaintiff previously had been a social worker for the county.

Plaintiff applied for a social worker position with the county on May 22, 2006. Mulder was responsible for forwarding applications to the head of the Department of Social Services. Mulder did not forward plaintiff's application to the interview committee, even though he forwarded all other applications with the exception of one person who already had been interviewed.

Mulder was aware of no problems with plaintiff's performance while he was the child support agency administrator. There were no complaints of plaintiff being unresponsive to client needs or of poor service. Mulder's only problem with the agency under plaintiff's regime was "the documentation process related to the [Department of Workforce Development] issue."

In a letter to the board dated December 21, 2006, Mulder addressed a local newspaper article about the cost of the county's child support enforcement program. Mulder noted that the child support agency's operation "remains at the forefront of county operations as the County defends against accusations of false claims for reimbursement made by former employees David Chapleau (Social Services Director) and Dave Haka (Child Support Agency Supervisor). These are the persons who were directly responsible for all operational and billing aspects of the child support program. That they now claim that

24

billings made at their direction were false is outrageous."

Kurszewski resigned as head of the child support agency in June 2007 upon the request of Mulder.

OPINION

A.  Lincoln County Board of Supervisors

The first question is whether plaintiff has properly named the Lincoln County Board of Supervisors as a defendant.  Defendants say no because the board lacks the capacity to be sued.  Under Wisconsin law (which governs this question, Fed. R. Civ. P. 17(b)), a government entity has the capacity to be sued if it has "independent proprietary powers or functions and [is] sufficiently independent of the state to be sued as such."  Townsend v. Wisconsin Desert Horse Association,  42 Wis. 2d 414, 423, 167 N.W.2d 425, 430 (1969).

Although there are a number of cases in which Wisconsin county boards have been named as defendants, neither side cites any cases in which a Wisconsin court has expressly considered whether a county board meets the Townsend standard.  Plaintiff cites Wis. Stat. § 59.02, which says that the "power of a county as a body corporate can only be exercised by the board," and Wis. Stat. § 59.51(2), which says that "the board may represent the county, have the management of the business and concerns of the county in all cases where no other provision is made, apportion and levy taxes and appropriate money to carry into

25

effect any of the board's powers and duties."  However, these statutes cut against plaintiff's position because they make it clear that the board is just an extension of the county.  The board "exercise[s]" the "power of a *county*" and "*represent[s]* the county."  The board does not have an independent existence apart from the county itself.

In any event, plaintiff does not explain what purpose is served by including the board as an additional defendant. He does not distinguish between the board and the county in his summary judgment materials, but treats them as interchangeable.  None of his claims is directed exclusively at the board. Because defendants concede that all of plaintiff's claims were brought properly against the county, naming the board was a redundancy. Accordingly, I will dismiss the complaint as to defendant Lincoln County Board of Supervisors.  For the remainder of the opinion, I will refer to Lincoln County as "defendant."

## B.  False Claims Act

As its name suggest, the purpose of the False Claims Act is to stop fraud against the federal government.  Although its initial targets were "unscrupulous Civil War contractors," Carl Pacini and Michael Bret Hood, The Role of Qui Tam Actions under the False Claims Act in Preventing and Deterring Fraud Against Goverment, 15 U. Miami Bus. L. Rev. 273, 273 (2007), its reach today is far broader.  The current version of the act prohibits anyone from "present[ing] . . . a false or fraudulent claim [to the federal government] for payment

26

or approval." 31 U.S.C. § 3729(a)(1).  Because there may be more fraud occurring than the federal government can prosecute on its own, the act includes a number of provisions aimed at encouraging private parties to ferret out false claims and report them.  Indeed, Congress has authorized private parties to file their own lawsuits when they believe they have discovered fraudulent activity.  31 U.S.C. § 3730(b).

Relevant to this case is 31 U.S.C. § 3730(h), the anti-retaliation provision of the False Claims Act.  Section 3730(h) recognizes that fraud committed by a corporation or local government may often be discovered by an employee and that employers may "not take kindly to having their crimes nosed out."  Lang v. Northwestern University, 472 F.3d 493, 495 (7th Cir. 2006).  To encourage employees to speak out, § 3730(h) prohibits an "employer" from "discriminat[ing]" against "any employee . . . because of lawful acts done . . . in furtherance of an action under this section."

Plaintiff says that three of defendant's decisions violate § 3730(h): (1) the September 27, 2005 resolution of the full board "reorganizing" the child support agency to make the assistant corporation counsel head of the child support agency; (2) the November 4, 2005 resolution of the Finance Committee expressly eliminating plaintiff's position and removing him from his duties; and (3) the refusal to rehire him in May 2006.  Accordingly, I will consider whether plaintiff has adduced sufficient evidence to show that any of these actions was motivated by conduct protected by § 3730(h).

27

1.  Reorganization of the child support agency

Defendant advances three reasons why it believes that eliminating plaintiff's position did not violate the False Claims Act: (1) plaintiff did not engage in any acts "in furtherance of an action under this section";  (2) even if plaintiff did engage in such conduct, defendant did not know about it; and (3) even if it did know, it did not eliminate plaintiff's position "because of" his protected activities.  The question I must decide is whether a reasonable jury could disagree with defendant on each of these points.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  I conclude that it could.

a.  In furtherance of an action under this section

Plaintiff says that his investigation of matters discussed in Chapleau's February 9, 2005 complaint to the United States Attorney is protected under § 3730(h).  Although that complaint did not lead to a lawsuit against defendant for fraud in violation of the False Claims Act, that does not doom plaintiff's claim.  In describing what constitutes an "ac[t] done . . . in furtherance of an action under this section," § 3730(h) says that it includes "investigation for . . . or assistance in an action filed *or to be filed* under this section."  Thus, even when no lawsuit is filed, § 3730(h) protects an employee's investigation of a *potential* claim, so long as a lawsuit "could be filed legitimately—that is, consistently with Fed. R. Civ. P. 11."  Neal v. Honeywell Inc., 33 F.3d 860, 864 (7th Cir. 1994).  See also Lang, 472 F.3d

28

at 495 (investigation of potential claim protected so long as it is "objectively reasonable")

Defendant does not argue that plaintiff had no basis for believing that it was submitting false claims for reimbursement. Instead, defendant's position is that plaintiff failed to act on his belief in a way that is protected by the statute.  But even defendant appears to be aware that this argument is not a good one.  It cites no authority and devotes a solitary sentence to the argument in its brief in chief, saying that plaintiff "had nothing to do with the creation or submission of [Chapleau's] letter."

Although it is true that plaintiff did not draft the February 9 complaint, this gets defendant nowhere because § 3730(h) is not limited to "complaint drafting"; it encompasses both "investigation for" and "assistance in" a potential claim.  It is undisputed that plaintiff helped Chapleau in investigating the potential false claims and that the information plaintiff gave Chapleau played a starring role in the complaint Chapleau submitted to the United States Attorney.  In its reply brief, defendant seems to suggest that plaintiff's investigation and assistance don't count because Chapleau raised issues in the February 9 complaint besides those investigated by plaintiff, but that argument makes no sense.  There is no basis in the statute for defendant's proposed "sole source" limitation and I see no reason to read one in.

b.  notice to defendant

29

As with any other retaliation claim, a claim under § 3730(h) requires proof that the defendant knew about the plaintiff's protected conduct. This is really a threshold requirement of proving that the defendant discriminated against the plaintiff "because of" activity protected by law. Obviously, an employer cannot be motivated by conduct of which it is unaware. Salas v. Wisconsin Dept. of Corrections, 493 F.3d 313 (7th Cir. 2007).

Defendant's motion raises an interesting question on this element: what sort of notice must the employer have? Is it enough that the employer knew about the conduct? Or does the employee have to show that the employer knew that the conduct was part of a False Claims Act investigation? In Brandon v. Anesthesia & Pain Management Associates, Ltd., 277 F.3d 936, 944 (7th Cir. 2002), the court appeared to say that the answer is somewhere in the middle: the plaintiff must show that his actions put the defendant "on notice of the 'distinct possibility' of a qui tam action" under the False Claims Act. In questioning whether the employer had sufficient notice, the court said that the employee "had never explicitly told the shareholders that he believed they were violating the FCA" and "never threatened to bring a qui tam action." Ultimately, the court concluded that it did not need to resolve the question.

Two years later the court appeared to backtrack a bit, saying that even the *employee* did not have to know that he was investigating a potential action under the False Claims Act or even be aware that the False Claims Act exists. Fanslow v. Chicago Manufacturing

30

Center, Inc., 384 F.3d 469, 480 (7th Cir. 2004). Of course, if the employee is not aware that he is engaging in a False Claims Act investigation, the employer cannot be aware either. Therefore, the court concluded that it is enough if the employer knew the employee was investigating a possible fraud on the federal government. Id. at 484. Plaintiff satisfied this standard as early as September 2003, when he informed his supervisor that he believed that the corporation counsel office might not be accurately reporting its time eligible for reimbursement under Title IV-D. He repeated and confirmed these views throughout 2004 in his own letters to board members and to Chapleau, who also communicated plaintiff's position in writing and at committee meetings.

Both Brandon and Fanslow contain dicta suggesting that a "heightened" notice requirement may exist when an employee's investigation was "part of the general course of his responsibilities." Brandon, 277 F.3d at 945. Relying on this dicta and cases from other circuits, defendant sets forth an elaborate argument that a heightened notice requirement applies in this case because plaintiff was a "fraud alert" employee who "was responsible . . . to ensure that appropriate claims were made." Dft.'s Reply Br., dkt #116, at 8.

Defendant's argument is a bit puzzling because it simply does not matter in this case whether plaintiff was a "fraud alert" employee. Even if he was, the court made it clear in Fanslow, 384 F.3d at 484, that the employee need tell his employer only that it is engaging in "illegal" billing practices. This standard is easily satisfied by the February 9 complaint,

which expressly accuses defendant of violating the False Claims Act.

Defendant argues in its brief that "[t]here is no evidence any Board member knew that Haka engaged in protected conduct at the time the September 2005 Resolution was passed." Dft.'s Br., dkt. # 56, at 21.  That simply isn't true.  It is undisputed that Simon and Powell read the February 9 letter and were aware of plaintiff's assistance in Chapleau's investigation.  As will be discussed further below, both of these men played a pivotal role in the decisions that led to plaintiff's elimination.  Further, the February 9 complaint was discussed in the course of at least one meeting of the full board in May 2005 and several committee meetings throughout the year.  Thus, it is reasonable to infer that all the members of the board were aware of the basic contents of the letter and, therefore, of plaintiff's involvement in Chapleau's investigation.


c. "because of"

A plaintiff asserting a claim under § 3730(h) must show that the defendant took an adverse act against him "at least in part" because of his protected conduct.  Fanslow, 384 F.3d at 479.  This standard is virtually identical to the "motivating or substantial factor" element in retaliation claims brought under the First Amendment.  In those cases, I have held that "motivating or substantial factor" means "one of the reasons" for the decision. Johnson v. Kingston, 292 F. Supp. 2d 1146, 1153-54 (W.D. Wis. 2003).

32

Plaintiff has adduced more than enough evidence to allow a reasonable jury to infer that his assistance in the False Claims Act investigation was one of the reasons defendant eliminated his job.  Defendant says that its decision "is not subject to attack absent attack o[n] the justifications for the reorganization."  Dft.'s Reply Br., dkt. #116, at 21.  But this is part of the problem for defendant: even its *stated* justification for reorganizing the child support agency is inextricably intertwined with plaintiff's protected conduct.

In the resolution that reorganized the child support agency, the first reason given for the change is that "Lincoln County has been embroiled in a long-running controversy concerning child support issues with the State of Wisconsin."  Of course, a big part of that "controversy" was plaintiff's and Chapleau's allegations that the county was improperly seeking reimbursement for child support enforcement activities.  Although this may not be a blatant admission that plaintiff's protected conduct was one of the reasons for the reorganization, a reasonable jury could infer that the resolution was a thinly veiled effort to oust the person who helped to ignite the "controversy" by accusing defendant of possible fraudulent behavior.

There were other stated reasons in the resolution, such as "improved efficiencies" and "sound financial management," but these are so vague that they do little to buttress defendant's position.  The facts show that none of the board members provided any documentation to support these conclusions. This was not just a failure to make clear at the

33

meeting what already had been otherwise established.  It is undisputed that no one did any real investigation to determine whether the reorganization would actually bring about the improvements identified in the resolution, that no one attempted to determine whether the assistant corporation counsel was qualified to head the child support agency and that no one ever seriously considered other options.  Instead, defendant focused on the one option that was sure to eliminate the position of the person who brought the problem to light.  In such a situation, summary judgment is not appropriate.

In any case, plaintiff has adduced sufficient evidence to permit a reasonable jury to infer that any legitimate reasons advanced by defendant are pretextual.  A number of board members made it quite clear in the months leading up to the September 27 resolution that they were displeased with the February 9 complaint that plaintiff helped to investigate and with whistle blowing in general.  Both Weaver and Lussow made statements in the context of discussing the complaint that "whistle blowers have got to go" and that whistle blowers should be fired.  Stronger sentiments of a retaliatory motive would be difficult to find.  Cf. Schmidt v. Lincoln County, State of Wisconsin, 249 F. Supp. 2d 1124, 1134 (W.D. Wis. 2003) (granting sua sponte summary judgment in favor of plaintiff in retaliation case in which one defendant had said, "That's why we are not selling [plaintiff] material, because he ripped on our highway department. And now should I turn around and sell material that would help somebody out that ripped on our highway department? I don't think so, folks.")

34

Although Chapleau rather than plaintiff may have been the primary target of these comments, they are probative of defendant's intentions toward plaintiff as well.  Again, although plaintiff did not write the complaint himself, he was deeply and publicly involved in it.  It is therefore reasonable to infer that the board members viewed plaintiff as a whistle blower because of his role in investigating the February 9 complaint.  Cf. Paz v. Wauconda, 464, F.3d 659, 666 (7th Cir. 2006) (finding probative of intent discriminatory remarks about other members of plaintiff's protected group).

Comments similar to Lussow's and Weaver's are not in short supply.  When board chairman Simon was asked at a committee meeting why Chapleau was being placed on administrative leave but Bergstrom was not, Simon responded that Bergstrom did not need to be suspended because she did not file a federal false claim complaint against the county. At the September 12 committee meeting considering the reorganization of the agency, Simon discussed plaintiff's cooperation with federal authorities in the false claims investigation.  Simon continued that he was asking the Wisconsin Attorney General's office to consider charges against any Lincoln County employee who provides information to federal authorities.  Again, it is difficult to imagine a statement more obviously hostile to plaintiff's protected conduct. It requires the drawing of the smallest inference to find that Simon wanted to eliminate plaintiff's position at least in part because of plaintiff's involvement in the False Claims complaint.

35

The evidence against Powell, the author of the resolution, may be strongest of all. Powell's reaction to the February 9 False Claims complaint was almost as severe as it was swift.  Lewis v. City of Chicago, 496 F.3d 645, 655-56 (7th Cir. 2007) (retaliatory intent may be inferred from defendant's change in behavior after plaintiff engaged in protected conduct).  Although Powell had never had any problems with either plaintiff or Chapleau in the past, after Powell received and reviewed the False Claims complaint, he never spoke to Chapleau again and began investigating both plaintiff and Chapleau, even on matters unrelated to the complaint.  In pursuing these investigations, he repeatedly made unsupported factual assertions that turned out to be false.  He acted aggressively to have Chapleau placed on administrative leave before any evidence of wrongdoing was found and later used the investigation to persuade Chapleau to resign.

Once that feat was accomplished, Powell quickly set his sights on plaintiff, or at least a reasonable jury could so find.  In an August 2005 letter that at one point reaches a near frantic tone, Powell proposed a reorganization of the child support agency that would eliminate plaintiff's position.  He considered no other alternatives and offered no evidence or argument for choosing this solution.  He quickly pushed his proposal through the committee and then the full board.  A reasonable jury could find that Powell was a man on a mission after he read the False Claims complaint and that mission was to rid the county government of plaintiff and Chapleau.

36

Defendant raises a host of arguments regarding why it believes plaintiff's evidence is insufficient to defeat its motion for summary judgment, but none of these arguments is persuasive. Its first argument is its most muddled. The gist of it appears to be that the court may not consider the motives of the individual board members to determine defendant's intent. Distilled, plaintiff's argument is one for immunity. Counties don't have motivations, people do. If this court is prohibited from looking at the motives of those who act on behalf of defendant, there would be no way for plaintiff to prove his claim.

Defendant cites a hodgepodge of cases from various different areas of law, but none of them actually supports its bizarre proposition that the intent of board members is irrelevant. For example, it is hardly surprising that courts have declined to examine an employer's motive in the context of a due process claim, e.g., Misek v. City of Chicago, 783 F.2d 98, 100-01 (7th Cir. 1986), because motive is not one of the elements of such a claim. In a claim like plaintiff's, in which he must prove that defendant acted "because of" his protected conduct, courts cannot resolve the claim without considering the employer's motives.

In Palmer v. Thompson, 403 U.S. 217 (1971), also cited by defendant, the Court held only that a discriminatory *intent* does not necessarily violate the law if there is no discriminatory *effect*. In Palmer, the city council had closed the public pool to avoid integration, but this affected all local residents equally, regardless of race. In this case,

37

defendant did not simply abolish the child support agency, it "reorganized" it so that plaintiff's position in particular was eliminated.  That is more than sufficient to qualify as a discriminatory effect.  (A support staff position was eliminated as well, but the importance of that decision is for the jury to consider.  A defendant may not overcome the plaintiff's evidence of discrimination simply by showing that other employees were similarly harmed. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 152-53 (2000).)  To the extent defendant reads <u>Palmer</u> to hold that legislators' intent is irrelevant in determining the validity of a law, later cases have discredited that view.  <u>Hunter v. Underwood</u>, 471 U.S. 222 (1985) ("[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection clause"); <u>Washington v. Davis</u>, 426 U.S. 229, 244 n. 11 (1976) ("To the extent that <u>Palmer</u> suggests a generally applicable proposition that legislative purpose is irrelevant in constitutional adjudication, our prior cases . . . are to the contrary.").

Defendant places its greatest emphasis on its argument that plaintiff has failed to show that a *majority* of the county board acted with a retaliatory motive.  Because plaintiff's evidence of animus relates only to a handful of the 21 board members, defendant says that plaintiff cannot prove that the board as a whole acted with an impermissible motive.  Questions of this sort have plagued courts for years: when a particular decision requires a vote from multiple individuals, what standard should be used in determining whether the decision was motivated by an impermissible factor?  Some courts have suggested that

38

defendant is correct that there may be no liability unless a majority of the members of the body harbor animus against the plaintiff, <u>Campbell v. Rainbow City</u>, 434 F.3d 1306, 1313 (11th Cir. 2006), while others have held that an unlawful motive of even one member may be sufficient for the plaintiff to satisfy his prima facie case, <u>Cine SK8, Inc. v. Town of Henrietta</u>, 507 F.3d 778, 786 (2d Cir. 2007).  Still others have taken a middle ground. <u>Scarbrough v. Morgan County Board of Education</u>,  470 F.3d 250, 262-63 (6th Cir. 2006) (rejecting view that plaintiff must prove improper motive of majority of board; applying "but for" test instead); <u>Scott-Harris v. City of Fall River</u>, 134 F.3d 427, 438 (1st Cir. 1997) (assuming without deciding that plaintiff could prevail by showing "bad motive on the part of at least a significant bloc of legislators" and "circumstances suggesting the probable complicity of others").  The parties do not cite any cases of the Court of Appeals for the Seventh Circuit addressing this issue head on and I am unaware of any.

As an initial matter, defendant's argument is somewhat of a red herring.  Because even the board's primary stated reason suggests that plaintiff's protected conduct may have played a part in the decision to reorganize the agency and eliminate plaintiff's position, it is not necessarily dispositive whether plaintiff can show a retaliatory motive on the part of the individual board members, majority or otherwise.

However, to the extent such evidence is necessary, I agree with the court in <u>Cine SK8</u>, 507 F.3d at 786, that "it is possible that, even if a majority of the individuals that participate

in the decision lack unconstitutional motives, the unconstitutional intentions of a minority of those involved can taint the ultimate outcome." It is important to keep in mind that the ultimate question does not relate to the number of board members who wished to retaliate against plaintiff but whether the board removed plaintiff "because of" his protected conduct. Even one member's animus may be enough to change the result, because of a closely divided vote or because that member influenced the vote of other members.

This is consistent with the court of appeals' repeated holdings that the discriminatory intent of a nondecision maker with "singular" or "significant" influence may be imputed to the decision maker. Brewer v. Board of Trustees of University of IL, 479 F.3d 908 (7th Cir. 2007); Rozskowiak v. Village of Arlington Heights, 415 F.3d 608, 613 (7th Cir. 2005); Hunt v. City of Markham, Illinois, 219 F.3d 649 (7th Cir. 2000). See also Lust v. Sealy, 383 F.3d 580, 584 (7th Cir.2004) ("If [the decision maker] would not have turned down [the plaintiff] for the promotion had it not been for [a nominal subordinate's] recommendation . . . then [the nominal subordinate's] sexism was a cause of [the plaintiff's] injury, whether or not [the decision maker] could reasonably be thought a mere cat's paw.") Thus, under the burden shifting framework of § 3730(h), once the plaintiff establishes the unlawful motive of an individual with significant influence over the decision making body, it becomes the defendant's burden to show that the board would have made the same decision even if that member did not have a retaliatory motive. Fanslow, 384 F.3d at 485.

40

Plaintiff has satisfied his burden.  Although plaintiff points to only a few board members, they are the important ones.  Simon was the chairman of the board and Powell was the author of the resolution and its advocate before the board.  Powell's own perception is that the board "trusted" his judgment.  Although some of the board members may have been unaware of plaintiff's involvement in the False Claims Act investigation, even if a majority of them harbored no retaliatory intent, that cannot defeat plaintiff's claim unless they independently considered the merits of the proposal.  Brewer, 479 F.3d at 920.  Defendant adduces no evidence that they did.  Rather, it appears that other board members gave little thought to the resolution and voted for it solely on Powell's recommendation, without knowing (as Powell did) that a vote for the resolution would lead to plaintiff's dismissal.

Defendant attempts to downplay plaintiff's evidence by saying that it began to consider eliminating plaintiff's position even before the February 9 complaint.  This argument is a nonstarter for at least two reasons.  First, plaintiff began his investigation *before* the February 9 complaint so that is not necessarily the magic date.  The facts show only that the Administrative and Legislative Committee began discussing how to deal with the "turmoil" in the child support agency in late 2004.  But this was well after plaintiff and Chapleau had reported their suspicions about the reimbursement claims of the corporation counsel office.  In fact, the fallout from those reports was likely part of the "turmoil" the

committee wanted to address.  In any event, a desire to solve problems between the child support agency and the corporation counsel office is a far cry from a decision to eliminate plaintiff from his job.

Simon was the only board member who considered before February 9 the possibility of making assistant corporation counsel head of the child support agency and even then it was only one of several possibilities. But this was still months after plaintiff had written to Simon about his involvement in the investigation.  It was not until *after* the February 9 complaint that Simon began pursuing ways to oust Chapleau and reorganize the child support agency in a way that would insure the elimination of plaintiff's position.

Statements from some of the board members suggest that they were dissatisfied with plaintiff not necessarily because he had exposed the county's false claims but because they believed that if there were any false claims, it was plaintiff's fault for failing to catch them. Of course, plaintiff denies that he is to blame for any reporting inaccuracies, but I need not resolve this dispute.  A stated reason that plaintiff caused the "controversy" himself is again so intertwined with plaintiff's protected conduct that the finder of fact would have to untangle the reasons to determine which was the real one.  Shager v. Upjohn Co., 913 F.2d 398, 402 (7th Cir. 1990) ("the task of disambiguating ambiguous utterances is for trial, not for summary judgment").  In any event, defendant has not suggested that any incompetence of plaintiff played a part in the elimination of his position.  It has repeated throughout its

42

briefs that plaintiff's performance had nothing to do with the September 27 resolution.

2. Eliminating plaintiff's position and removal from duties

In arguing that defendant passed the November 4 resolution in violation of § 3730(h), plaintiff relies not just on the February 9 complaint and his cooperation with federal authorities in investigating that complaint, but on his own False Claims Act complaint that he filed on October 31.  Defendant argues that plaintiff's October complaint is not protected because it was substantially similar to Chapleau's earlier complaint, but this argument is misguided for two reasons.

First, it is not just the complaint itself that is protected, but the investigatory activities that plaintiff describes in it.  It may be that the second complaint is "recycled" but that because of it, the employer learns for the first time that the employee was conducting an investigation and fires him as a result.   Second, even if I excluded the October 2005 complaint from consideration, it would make no difference for the purpose of defendant's motion for summary judgment.  Many of the important decision makers at the November 4 finance committee hearing were already well aware of plaintiff's involvement in February 9 False Claims Act complaint.   Of these, Mulder was the most important.  Although he was not a member of the board, he made the recommendation to remove plaintiff and each of the members followed his recommendation without question.  Markel, 219 F.3d at 653.

43

Plaintiff has adduced sufficient evidence that Mulder (and therefore defendant) may have been motivated by plaintiff's protected conduct to have him terminated.  Mulder has admitted that he believed the substance of the February 9 complaint to be "outrageous." Spiegla v. Hull, 371 F.3d 928, 943 (7th Cir. 2004) (official's admission that he was "pretty pissed" by plaintiff's comments supported retaliation claim).  He joined Powell in seeking Chapleau's forced resignation after he filed the February 9 complaint and, like Powell, he failed to articulate grounds for doing so that were unrelated to the complaint itself.  In addition, Mulder joined Simon in pointing out at the September 12 committee meeting (at which the committee considered the reorganization of the child support agency) that plaintiff had been cooperating with federal authorities. When at the same meeting Simon said that he was asking the Wisconsin Attorney General's office to consider charges against any Lincoln County employee who provides information to federal authorities, Mulder did not object to this suggestion. Instead, he asked a board member sympathetic to plaintiff whether *she* had provided such information.

Further, the facts establish that Mulder removed plaintiff from his position with no small amount of zeal.  He boasted in October 2005 that he was going to "get rid of" plaintiff before the end of the year.  At the November 4 hearing, he pushed through his proposal to eliminate plaintiff's position in approximately 10 minutes.  He did not seek to reassign plaintiff to another position and he sought to immediately remove plaintiff from his duties

44

without even considering whether plaintiff's replacement was ready to assume plaintiff's responsibilities.  But the *coup de grâce* may be Mulder's response to the committee's adoption of his proposal:  Mulder saw the need to purge the county of plaintiff's presence as so urgent that he escorted plaintiff off the property immediately .

Mulder gave reasons for plaintiff's immediate removal at the November 4 hearing, but a reasonable jury could find these reasons to be pretexts.  Mulder admits that he had no basis to believe that plaintiff was destroying work-related documents.  His assertions that plaintiff was "disgruntled" and that he could be "unhealthy" for the work environment reveal little more than that Mulder disliked plaintiff.  Mulder's statement that other employees had complained about plaintiff is true, but unavailing.  Although Mulder says now that he believed plaintiff used poor judgment in the way he interacted with Yorde, this assertion is undermined by Mulder's failure to take any action at the conclusion of his investigation of the Yorde complaint.  Ajayi v. Aramark Business Services, Inc., 336 F.3d 520 (7th Cir. 2003) (defendant's failure to take action on complaints supports finding of pretext); see also Pantoja v. American NTN Bearing Manufacturing Corp., 495 F.3d 840 (7th Cir. 2007) (finding of pretext supported by employer's delay in taking disciplinary action until after employee engaged in protected conduct). Even if all of Mulder's reasons had a basis in fact, none of them could explain why plaintiff had to be physically removed from the premises immediately after the resolution passed.

45

Because it is undisputed that all of the Finance Committee members adopted Mulder's recommendation without question, it is unnecessary to further explore the motivations of the committee members.  Doing so would not help defendant in any event, because three of the five committee members (Powell, Lussow and Weaver) had displayed hostility to the February 9 complaint previously, as discussed above.  A reasonable jury could find that plaintiff's protected conduct was one of the reasons defendant failed to reassign plaintiff.

3. Failure to rehire

a. "employee"

Plaintiff applied for another position with defendant in May 2006, but Mulder refused to forward plaintiff's application to the hiring committee.  Defendant advances a brief argument that § 3730(h) does not apply to plaintiff's failure to rehire claim because the statute covers "employee[s]," not former employees.  However, the Supreme Court rejected the same argument in the context of Title VII's anti-retaliation provision, concluding that the term "employee" was ambiguous because it could be interpreted reasonably either to incorporate or omit a temporal limitation.  In holding that "employee" included former employees, the Court emphasized that such an interpretation was necessary to effectuate the provision's primary purpose:  "[m]aintaining unfettered access to statutory remedial

46

mechanisms." <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 (1997).  In other words, because postemployment retaliation may deter the reporting of unlawful conduct just as much as retaliation occurring during employment, limiting  "employees" to "current employees" would limit the effectiveness of the statute.  Defendant does not distinguish <u>Robinson</u> from this case (or even cite it) and the logic of that case applies equally to plaintiff's claim.

There is one textual distinction between Title VII's retaliation provision and § 3730(h)'s: Title VII's provision extends to any retaliatory action that is sufficiently adverse, <u>Burlington Northern and Santa Fe Railway Co. v. White</u>,  126 S. Ct. 2405, 2415 (2006), while § 3730(h) applies only to retaliatory actions "in the terms and conditions of employment."  However, a reasonable interpretation of the phrase would include a decision to hire.  In any event, defendant does not raise that issue so I need not resolve it now.

b.  "because of"

_____I have concluded that Mulder was aware of plaintiff's protected conduct and that a reasonable jury could find that he was motivated by that conduct in removing plaintiff instead of reassigning him.  Defendant identifies no reason for concluding otherwise with respect to plaintiff's failure to rehire claim.  It is unlikely that whatever animus Mulder had against plaintiff in November 2005 had dissipated by May 2006; Mulder was still harshly

criticizing plaintiff's actions related to the False Claim scomplaint as late as December 2006. Further, the only reasons Mulder gives for refusing to forward plaintiff's application relate to the employee complaints against plaintiff. As I have said, a jury could find this reason to be pretextual. Summary judgment must be denied with respect to plaintiff's failure to rehire claim.

## C.  First Amendment

Plaintiff does not contend that either of the False Claim complaints was protected by the First Amendment, but he says that his November 9, 2004 letter to Bergstrom is protected and that it too played a part in the decision to eliminate his position. In that letter plaintiff questioned the child support agency's need for 40 hours a week of legal services.

The basic framework for a First Amendment retaliation claim is essentially the same as the one under the False Claims Act: Did the plaintiff engage in conduct protected by the Constitution; if so, can the plaintiff show that the defendant was motivated to take an adverse action against the plaintiff because of the protected conduct; and, if so, can the defendant show that he would have taken the same action, even if the plaintiff had not exercised a constitutional right? Mt. Healthy Board of Education v. Doyle, 429 U.S. 274, 287 (1977).

48

Until recently, the determination whether an employee's speech was constitutionally protected began with the question whether it touched on a matter of "public concern." Spiegla, 371 F.3d at 935. Then came Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), which substantially narrowed the scope of protected speech in the public workplace. Now, regardless of the subject of the speech or how important it is, public employees may sue for retaliation under the First Amendment only if they are "speaking as citizens," id. at 1960, rather than "pursuant to their official duties," id. at 1959-60. The rationale of the Court was that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id.

The gray area between speech made pursuant to an official duty and speech made as a citizen is significant. In Garcetti, the parties agreed that the plaintiff's speech had been made pursuant to his official duties, so the Court did not need to reflect on that question further. In this case, plaintiff's speech does not fit perfectly into either category. In one sense, plaintiff was not speaking pursuant to a duty because he did not have authority over the matter he was addressing: the parties agree he had no control over the number of hours that the assistant corporation counsel devoted to child support enforcement activities. In fact, that point was emphasized by those who disagreed with plaintiff's view. On the other

49

hand, it is not necessarily accurate to say that plaintiff was acting as just another citizen.  He was speaking out about the needs of his own agency, not an abstract matter of public governance unrelated to his job.

There are plausible arguments for reading the Garcetti exception narrowly.  For example, the Court stated that the First Amendment may protect an employee's speech enough though it "concern[s] the subject matter of the [plaintiff's] employment."  Id. at 1959.  But the court of appeals has tightened even further whatever wiggle room Garcetti left.  In fact, the effect of Garcetti in this circuit has been devastating for public employees asserting claims for First Amendment retaliation.  In nearly every such case decided by the court of appeals since Garcetti, the court has concluded that the employee's claim failed because he or she was not speaking as a citizen.  E.g., Vose v. Kliment, 506 F.3d 565 (7th Cir. 2007); Sigsworth v. City of Aurora, Illinois, 487 F.3d 506 (7th Cir. 2007); Spiegla v. Hull, 481 F.3d 961 (7th Cir. 2007) (overruling earlier opinion because of Garcetti); Mayer v. Monroe County Community School Corp., 474 F.3d 477, 480 (7th Cir. 2007); Mills v. City of Evansville, Indiana, 452 F.3d 646 (7th Cir. 2006).

Vose is the decision that most clearly dooms plaintiff's claim.  The plaintiff in that case was a police sergeant who supervised the narcotics unit.  He complained to his supervisor that detectives in the major case unit were conducting investigations in a manner that could compromise his unit.  The situation escalated over the next few months and the

50

plaintiff's supervisor ultimately moved him to a less desirable position.   After he filed a lawsuit claiming First Amendment retaliation, the court of appeals rejected his claim under Garcetti.  Although the plaintiff said "that his official duties as supervisor of the narcotics unit did not include responsibility for investigating potential misconduct of officers in another unit," the court did not find this to be persuasive:

> Vose may have gone above and beyond his routine duties by investigating and reporting suspected misconduct in another police unit, but that does not mean that he spoke as a citizen and not as a public employee. . . . Because Vose was responsible for the operations of the narcotics unit, his speech regarding alleged misconduct that may affect his unit was made pursuant to his official responsibilities, and not as a private citizen, despite not having explicit responsibility for the detectives involved or the search warrants at issue

Vose,  506 F.3d at 570 -571.

The situation is the same in this case.  Although plaintiff may have gone "above and beyond his routine duties" by seeking to reduce the number of hours corporation counsel devoted to child support matters, he was addressing a matter that would affect his agency. Accordingly, I must conclude that Garcetti bars plaintiff's First Amendment claim.


D.  State Law Claims

Plaintiff asserts two claims for "wrongful discharge" under state law, one claim that he was terminated in violation of public policy and one claim that he was terminated without "just cause."  Both claims fail.

51

1.  <u>Public policy</u>

Under Wisconsin law, employers can hire or fire an employee for almost any reason, unless otherwise restricted by statute or contract.  <u>Vorwald v. School District of River Falls</u>, 167 Wis. 2d 549, 482 N.W.2d 93 (1992). A narrow exception exists if the employee was fired "for fulfilling, or refusing to violate, a fundamental, well-defined public policy or an affirmative legal obligation established by existing law."  <u>Bammert v. Don's Super Value</u>, 2002 WI 85, ¶3, 254 Wis. 2d 347, 646 N.W.2d 365.  However, the exception is even narrower than this statement from <u>Bammert</u> suggests:  "[w]here the legislature has created a statutory remedy for a wrongful discharge, that remedy is exclusive."  <u>Brockmeyer v. Dun & Bradstreet</u>, 113 Wis. 2d 561, 576 n. 17, 335 N.W.2d 834 (1983).   In other words, a common law tort action for violating public policy is available only when the employee has no other remedy.

Plaintiff concedes that his state law wrongful discharge claim is premised on the same facts as his claims under the False Claims Act, but he fails to respond meaningfully to defendant's argument that his wrongful discharge claim is barred by the availability of a remedy under § 3730(h).  The closest he comes is a citation to <u>Brandon</u>, 277 F.3d 936, which he says "addresses the issue  . . . whether [he is] precluded from pursuing a wrongful discharge state law claim if he has a remedy under other laws."  Plt.'s Br., dkt. #100, at 78.  Plaintiff is partially right, but not in a way that helps his case.  In <u>Brandon</u>, the court

considered whether the False Claims Act *preempted* a state whistle blower law in Illinois and concluded that it did not.  The question in this case is not one of federal preemption but of the scope of state law.  Although the False Claims Act may not require the dismissal of plaintiff's wrongful discharge claim, Wisconsin law does.

To the extent that plaintiff means to argue that in <u>Brockemeyer</u> the court was concerned only with the question whether an alternative *state law* remedy existed, I disagree.  In considering whether the public policy exception applies, the Wisconsin Supreme Court has not distinguished between state and federal law.  For example, in <u>Strozinsky v. School District of Brown Deer</u>, 2000 WI 97, 237 Wis.2d 19, 614 N.W.2d 443, a case cited by plaintiff, the court held that an employer in Wisconsin could be held liable for wrongful discharge when it fired an employee for refusing to violate *federal* tax laws.  If the court  does not distinguish between federal and state law for the purpose of determining what constitutes public policy, it follows that the court would not do so for the purpose of determining what constitutes an alternative remedy.

2.  <u>Just cause</u>

Plaintiff says that various Lincoln County ordinances prohibited defendant from terminating him without "just cause."  Putting to the side the question whether these ordinances could give rise to a right of action, one would still look through them in vain for

anything remotely resembling a "just cause" requirement.  For example, plaintiff cites ordinances saying that a probationary employee is subject to termination "without recourse" and that a nonprobationary employee has a right to file a grievance.  It is true that plaintiff was a nonprobationary employee, but at most the ordinances suggest that plaintiff may have had a procedural right to challenge a discharge.  He points to no substantive limitations on defendant's right to terminate him.  Instead, he says repeatedly that the county ordinances and policies do not give defendant the authority to terminate him at will.  They didn't have to: *all* employment in Wisconsin is presumed to be at will unless otherwise specified by law or contract.  <u>Brockmeyer</u>, 113 Wis. 2d at 567, 335 N.W.2d at 837.

Plaintiff cannot prevail on either of his state law claims.  Defendant's motion for summary judgment will be granted with respect to both of them.


ORDER

IT IS ORDERED that

1.  The motion for summary judgment filed by defendants Lincoln County and Lincoln County Board of Supervisors, dkt. #55, is GRANTED with respect to plaintiff David Haka's claims against Lincoln County Board of Supervisors.  Plaintiff's complaint is DISMISSED as to that defendant.

2.  Defendants' motion is GRANTED with respect to plaintiff's claims under the First

54

Amendment and state law against defendant Lincoln County.

    3.  Defendants' motion is DENIED with respect to plaintiff's claims under the False

Claims Act against defendant Lincoln County.

    4.  Defendants' motion to "strike," dkt. #127, is DENIED as untimely.

    Entered this 4th day of February, 2008.

<div style="margin-left: 40%">

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

</div>