IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID F. HAKA,

                      Plaintiff,

          v.

LINCOLN COUNTY,

                  Defendant.

OPINION AND ORDER

06-cv-594-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This civil action brought by plaintiff David R. Haka for damages and reinstatement went to trial on April 3, 2008.  Plaintiff sought damages and reinstatement from his former employer, Lincoln County, claiming that he had been retaliated against in violation of the False Claims Act, 31 U.S.C. § 3730(h).  This statute prohibits employers from taking adverse actions against employees because of lawful acts done in furtherance of an action under the statute.  The statute's protections extend to investigation leading to an action, initiation of a claim, testimony on behalf of a claim or assistance in an action.

      Plaintiff alleged that he had lost his job as the child support administrator for Lincoln County because he had assisted his supervisor, David Chapleau, in the investigation of a False Claims Act claim based on legally improper charges for time purportedly spent on child

1

support activities.

At the final pretrial conference, the parties agreed that the court would decide whether plaintiff's conduct constituted protected activity under the False Claims Act. This is a two-part question:  (1) does the employee in good faith believe and (2) might a reasonable employee in the same or similar circumstances believe that the employer is committing fraud against the government?  Fanslow v. Chicago Mfg. Center, Inc., 384 F.3d 469, 480 (7th Cir. 2004).  Accordingly, it was agreed that a two-day court trial would precede the trial to the jury.

After hearing evidence, I concluded that the answer to the two-part question was "no."  I found for a number of reasons that plaintiff did not have a good faith belief that Lincoln County was committing fraud and that no reasonable employee in his position would have had such a belief.  For the record, I will set out my findings of fact and the reasons for my conclusion.

First, the cast of characters.  As I have noted, plaintiff was the administrator of Lincoln County's child support program, which was part of the county's social services department headed by David Chapleau, plaintiff's supervisor.  The child support program was reimbursed in part for many of its expenses by the federal government through the federal government.  The Lincoln County corporation counsel's office performed certain services for the child support program under a cooperative agreement between it and the

2

social services department.  Assistant Corporation Counsel Donald Dunphy, his secretary, Sandra Yorde, and another employee, Cathy Tupper, provided the services.  Then and now, the corporation counsel was Nancy Bergstrom and John Mulder was the administrator and personnel director of Lincoln County.  Mary Maluegge was a fiscal information specialist in the child support program.

The setting:  the social services department and the offices of the corporation counsel were housed in the same building.  Plaintiff's office was across the hall from the corporation counsel's offices.

The False Claims Act claim:  On February 9, 2005, David Chapleau filed a False Claims Act claim with the United States Attorney for the Western District of Wisconsin, alleging that the county corporation counsel had submitted false charges for reimbursement of time spent on child support work by assistant corporation counsel Dunphy and program assistant Tupper.  Plaintiff assisted Chapleau in gathering information for the claim.  Mulder and the president of the Lincoln County board received copies of the claim about the same time that it was filed, presumably from Chapleau.

In June 2005, for reasons not relevant to this decision, the county reached an agreement with Chapleau that he would leave in return for one year of salary.  On September 27, 2005, the country approved a reorganization of the child support program, to make it a stand-alone program headed by a lawyer and not requiring any legal assistance from the

3

corporation counsel's office. On October 10, 2005, Mulder told a member of the county board that it was likely that the board would get rid of plaintiff before the end of the year. Three weeks later, on October 31, 2005, plaintiff filed his own False Claims Act claim based only on Tupper's allegedly improper time charges. As a result of the reorganization, plaintiff lost his job as head of the child support office. Some time later he applied for a social worker position in the office and was not hired.

Background: In early 2003, two years before Chapleau filed his False Claims Act claim, plaintiff asked Sandra Yorde to go out with him on dates: once, when he had learned she was in the process of divorcing her husband and once when the divorce was final. Yorde declined both invitations. On November 21, 2003, Yorde complained to Bergstrom about her concern that plaintiff was treating her in a way that suggested he was retaliating against her for refusing to go out with him earlier in the year. Both plaintiff and Chapleau were angry about the complaint. Chapleau discussed it with Bergstrom, saying he thought it was "complete bullshit" and telling her that "her women" obviously had too much time on their hands if they had time to do all this complaining.

Yorde's complaint was reviewed by Mulder, who interviewed both Yorde and plaintiff. He concluded that no harassment had occurred but he told plaintiff he had used poor judgment in asking a subordinate for a date.

From the time that Tupper began working for the Lincoln County corporation

4

counsel as a program assistant in 1992, she billed time for child support work that she performed.  From at least 2002 forward, that work included answering telephone calls, distributing faxes and covering for Sandra Yorde when Yorde was on breaks, at lunch, on leave or working flex-time.  From the time that plaintiff became administrator of the program in 2000, all of the billing for corporation counsel work came to him for review and submission to the state for reimbursement.  Plaintiff never questioned Tupper's or Dunphy's time sheets until mid-January 2004.

(I do not believe plaintiff's and Chapleau's testimony that plaintiff discovered for the first time in late August or early September 2003 that Tupper was charging child support for her time.  It makes no sense that this would have been the first time he discovered it; it makes no sense that he knew about it as long as he did without doing more about it. Plaintiff testified that after he told Chapleau about the charges, Chapleau told him simply to monitor the situation and see whether Tupper was continuing to charge for her time and that plaintiff's response was to mark the date November 17, 2003 on his calendar as the next day to discuss the problem with Chapleau.  Plaintiff testified that Chapleau was too busy to talk on November 17 but plaintiff caught him in the hall the next morning at 8.  Plaintiff testified that when he told Chapleau that the charging was continuing, Chapleau said he would take it up immediately with corporation counsel and he proceeded into her office, where he had an angry meeting.  Plaintiff testified also that when Chapleau came out of the

5

meeting, he stopped at plaintiff's office and said that the meeting had not gone well. Corporation counsel's records show that she was out of the office participating in interviews of applicants for a county position the entire day.  Moreover, on three occasions after November 18, 2003, Chapleau had meetings with people that would have been concerned about the accuracy of time charges, such as corporation counsel, county administrator John Mulder and the Social Services Committee, and never mentioned his concern.  It was not until January 19, 2004, that Chapleau brought up the issue with corporation counsel and Mulder.)

It was the duty of the child support office and of plaintiff in particular to review and process properly documented claims for forwarding to the state for reimbursement. Although plaintiff was responsible for the reimbursement claims, before September 2003, he never examined the time submissions from Tupper and Dunphy to confirm their accuracy.  He claims not to have been aware of any charges from Tupper before then, although she was submitting 25% of her time for reimbursement in 2002.  During the same year, Dunphy was reporting that on some days he had worked only two hours on child support matters but his time was always submitted to the state at 100%.

Plaintiff never asked Tupper or corporation counsel why Tupper was billing so much time to child support; instead, he testified, he assumed that because she was not one of the persons authorized to use the state's child support computer program, she could not be 7

6

doing anything of value to the child support program.  He was aware that Tupper covered for Yorde when Yorde was on lunch or break or after she left around 3 in the afternoon. Mary Maluegge worked for the child support program from July 2001 to July 2004; she was aware that Tupper was billing time to child support when she covered for Yorde.  Every two weeks she received time sheets from corporation counsel showing the amount of time their staff was charging to child support.

After the end of August 2003, plaintiff continued to submit corporation counsel's time to the state for reimbursement.  He did not undertake a review of any past charges to see how long the allegedly illegal practices had been in effect.  A state audit undertaken in 2004 showed that the county may have overcharged for corporation counsel's work by as much as $282,000 for the years 2002-04.  The amount was later reduced to $20,000 in 2007.

DISCUSSION

Given the findings of the state's 2004 audit, it is difficult to say that there was no problem with the county's billing practices.  But the issue is not whether the county's billing could be improved.  Under Fanslow, 384 F.3d at 480, plaintiff must prove that when he helped Chapleau with his False Claims Act claim, he really believed that the county was submitting fraudulent claims to the government and that his belief was a reasonable one

given the fact that he knew.  Although it is impossible to know what was in a person's mind at any time, particularly four or five years later, plaintiff's actions in mid-November 2003 provide clues to his thinking.  They do not support his assertion that he believed he had uncovered true fraud.

Plaintiff testified that after he "discovered" Tupper's charges for the first time in late August or September 2003, he brought them to Chapleau's attention and then acceded to Chapleau's suggestion that he simply "monitor" Tupper's future time charges to see whether the overcharges continued.  This testimony is not believable.  It makes no sense.  Plaintiff was responsible for the accuracy of the claims for reimbursement that he submitted to the state.  If those claims were inaccurate, he or his supervisor or both could be subject to prosecution for having filed false claims.  The predictable response for someone in such a situation would have been to try to clear up the matter as quickly as possible and to examine past charges to see how long the apparent overbilling had been in effect.  If plaintiff truly believed that Tupper's charges were fraudulent because they were not properly subject to federal reimbursement, and not simply mistaken, is it reasonable to believe that he would not have said to Chapleau or even to Mulder something to the effect of "I can't be responsible for submitting these claims for reimbursement."

Moreover, plaintiff offered no excuse for not making any inquiry into Tupper's actual duties once he realized that she was submitting charges representing as much as 25% of her

8

work time.  Surely, as the accountable person for submitting her charges, he had a significant stake in the accuracy of those charges and, one would think, an equally significant motivation to find out whether they were justified.  Again, his testimony was that he never asked such questions but left the whole matter up to Chapleau, his supervisor.  His reaction is oddly detached for a person who, if his suspicions are correct, has been submitting fraudulent claims to the state for federal reimbursement for years.  When asked why he continued to submit the questionable charges, he said it was because he did not think he had the authority to change the figures Tupper submitted and because he did not know what she did.  His own testimony is to the contrary:  he knew that Tupper covered for Yorde for significant periods of the day.  Even if he had forgotten this, he occupied the office next to Tupper's.  In seconds he could have walked next door to ask her about the work she was doing for the child support program.  His failure to make even this straightforward inquiry makes it even more implausible that he had a good faith belief that the county was filing false claims for reimbursement.

One more improbability:  Tupper and Dunphy had been submitting charges for time as long as plaintiff had been head of the child support program. At least in 2002, Tupper's charges for child support duties often represented 25% of her work time and Dunphy showed that on different occasions he had worked less than 100% of his time on child support.  Is it conceivable that plaintiff never noticed any of this but was caught by surprise

9

when he came across a document in 2003 that supposedly showed the percentage of time that Tupper was claiming?  Or that he would have been startled to learn that Dunphy sometimes did work on matters other than child support ?

Both plaintiff and Chapleau testified that they were justified in believing that Tupper had been submitting inflated charges for time when her charges went down precipitately in mid-November 2003.  They say that they found it suspicious that this happened just about the time they noticed how much she was billing and after Chapleau supposedly discussed the matter with corporation counsel. Tupper's own testimony, corroborated by corporation counsel, was that she started working fewer hours during that period because her husband had a lung transplant and she needed to care for him in the mornings.  Is it likely that plaintiff and Chapleau would not have been aware of Tupper's situation, given the proximity of plaintiff's office to Tupper's and the small staff in both offices?

I concluded at the end of the court trial that the evidence adduced at the court trial does not support plaintiff's contention that he had a good faith belief in the fall of 2003 that the corporation counsel's office was submitting fraudulent documentation to him of hours worked by the staff of that office.  That timing is critical to plaintiff's claim of a good faith belief because it predates his discovery that Sandra Yorde had filed a complaint against him for retaliation on November 21, 2003. It underlies his entire case, which rests on his assertion that his discovery of the overbilling came before he was aware of the Yorde

10

complaint when he would have been motivated either to create an issue for the protection of his job or to prove that Bergstom's "women" had too much time on their hands.

Not only is it not credible that in the fall of 2003 plaintiff believed in good faith that Lincoln County was committing fraud against the federal government, it is not credible that an objective person in the same circumstances as plaintiff would have held such a belief. The anonymous reasonable person would have wanted more information from and about Tupper, her work duties and hours before concluding that the time charges were probably fraudulent. That same person would have examined the records to compare what the child support program had been submitting to the state and would have re-examined the time charges before filing a False Claims act claim. In short, no reasonable person would have reached an opinion on the falsity of Tupper's time charges on the basis of the information known to plaintiff in the fall of 2003.

The decision that plaintiff could not prove that he had both a good faith belief and a reasonable belief that he was engaged in protected activity under § 3730(h) of the False Claims Act required dismissal of the entire case.


ORDER

IT IS ORDERED that plaintiff David F. Haka's suit against defendant Lincoln County is DISMISSED with prejudice and, by agreement of the parties, without costs. The

11

clerk of court is directed to enter judgment for defendant and close the case.

Entered this 14th day of April, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge